UNITED STATES *v.* LOUIS WOLF & CO. (INC.) ET AL. (No. 3200)[1]

United States Court of Customs and Patent Appeals, November 25, 1929

*Charles D. Lawrence*, Assistant Attorney General (*Philip Stein* and *Fred J. Carter*, special attorneys, of counsel), for the United States.
*Allan R. Brown* for appellees.
*Lamb & Lerch* (*John G. Lerch* of counsel), *amici curiæ*.

[Oral argument October 7, 1929, by Mr. Carter, Mr. Brown, and Mr. Lerch]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

BLAND, Judge, delivered the opinion of the court:

The issue at bar involves the proper classification of merchandise classified as toys by the collector and covered by two protests, one by Louis Wolf & Co. (Inc.) and the other by W. J. Byrnes & Co., of New York.

The articles of importation before the court below and, with one exception, before this court, are the subject matter of two protests, the first one covering:

Exhibit 1, "Bull board."
Exhibit 2, "The children's railroad," or "A box of puzzles."
Exhibit 3, "Ring my nose."
Exhibit 4, "Steeplechase."
Exhibit 5, "Halloween ring toss."

As to Exhibit 2 of this protest there is no issue here. The court below overruled the protest as to this item and there was no cross appeal filed.

In the second protest the exhibits are:

Exhibit 1, "Coasting."
Exhibit 2, "Ludo and royal ludo."
Exhibit 3, "Up and down, the new ladder game."
Exhibit 4, "Trains of the world."

As to the first protest: Exhibit 1, "Bull board," consists of 12 squares on a paper-box lid about 10 by 12 inches in size. Ten of the squares are numbered from 1 to 10. On each of the two remaining squares is a colored picture of the head of a bull. The numbers are white on a blue background. Accompanying the board are ten paper disks about one-eighth of an inch in thickness and two inches in diameter. Exhibit 5 is a box containing a flat cardboard image of a pumpkin, on one side of which is a picture of a face, hobgoblin in character, with a hooked nose, apparently made of papier-mâché, attached thereto. There are also two metal hooks on the chin. Accompanying same are seven thin, small, paper rings in different

colors, designed to be thrown at the nose and hooks. The box is labeled "Spear's Halloween Ring Toss." Below the nose is a number 10 and below the hooks are numbers 5 and 3, respectively. The numbers ringed are counted until the game ends at 100. Exhibit 4, "Steeplechase," consists of a folding piece of cardboard about 8 by 13 inches upon which is a circular race track containing numbers on the inner and outer margins of same. Accompanying the board are four small metal horses with riders, and numbers on small pasteboard cards ranging from one to four. The box also contains a cheap wooden die. There are no rules accompanying the game, but the record shows that the horses are advanced on the race track as the numbers are obtained by shaking the die. Exhibit 3 is substantially the same as Exhibit 5 except it is called "Ring my nose," and instead of the board being a pumpkin face, it is a clown face with two additional hooks for the rings.

In the second protest: Exhibit 1, "Coasting," is a folding piece of cardboard 12 by 15 inches with a winter scene of trees, snow, birds, children on sleds, etc., and zigzagging across the picture is a coasting snow trail divided into spaces about 1 inch square and numbered from 1 to 75. Accompanying the board is a pair of dice and five small metal sleds upon each of which is seated a child. By shaking the dice the sleds containing the children are advanced on the board. Exhibit 2, "Ludo and royal ludo," is played with a board with circles, characters, and squares on the paper face thereof. The board is evidently of paper, and folds. From the "rules of the game" it appears that a die or dice accompanied the exhibit, although none is at bar. By throwing the die or dice, small buttonlike disks known as "men" (which are not at bar) are moved in and out of "prison" and brought back "home" again. The game of royal ludo is slightly more complicated. Exhibit 3, "Up and down, the new ladder game," is a folding paper board upon the face of which are a great many numbers located in squares into which the board is evenly divided. There are also a number of pictures, grotesque and clownish in appearance, scattered about on the face of the board. A pair of dice and small metal children and animals accompany the board for the purpose of being moved on the numbers in accordance with the numbers obtained by shaking the dice. The numbers range from 1 to 130 and you go "up and down" the ladder by going from number 1 to 130 and back to number 1. Exhibit 4, "Trains of the world," consists of cardboard about 7 by 8 inches, from the face of which have been cut out 8 diamond-shaped sections. The cut-out portions are numbered. When the numbered portions are put back in the places from which taken, the completed picture on the face of the card is

shown. It is a very simple, childish puzzle akin to a simple jig-saw puzzle.

Each of the above exhibits, except "Ludo and royal ludo," is contained in a box highly colored, upon which are pictures of interest to children, and all of them have the appearance of Christmas or Halloween merchandise. The ludo game is not contained in a box, as it appears here, but the absence of the dice and the "men" suggest that a box probably at one time accompanied the importation. The ludo board is of simple and cheap construction and composition.

The United States Customs Court, except as to Exhibit 2 in the first protest, sustained the protests of importers and held the merchandise to be dutiable at 35 per centum ad valorem under paragraph 1313 as manufactures of which paper is the component material of chief value.

The Government urges here that this action on the part of the court below was erroneous, if for no other reason, because the importers failed to show, and the evidence as a whole, including the samples in the case, fails to show what the component material of chief value is.

In view of the fact that most of the articles consist of several different materials, we are inclined to agree with the view expressed by the Government, but since we must disagree with the court below on its decision of the more important question involved in the case, to the effect that the merchandise was not toys, we regard it as important to decide and discuss this phase of the case.

The trial court, in holding that the articles were not toys, said:

Unquestionably, with the exception possibly of the puzzle, Exhibit 2, "The children's railroad," these games "were not intended and designed for the amusement of children only" within the rule enunciated in the *Illfelder* case, 1 Ct. Cust. Appls. 109, T. D. 31115. Amusement or interest may be derived from these articles, but it is not solely children's amusement. The "amusement of children only" referred to in the *Illfelder* case, *supra*, is that which a child obtains from playing with some trifling article, which will give him pleasure without necessitating the exercise of ability or skill to obtain amusement therefrom.

    \*      \*      \*      \*      \*      \*      \*

These articles, with the exception of the puzzle, would also amuse the mature mind. They do not fall, either in fact or in law, within the classification of toys, as that term has been defined by the courts.

With the rule in the *Illfelder* case as a standard all these toy questions become matters of fact, determined by the testimony and an inspection of the exhibits. The use of these articles satisfactorily established that with the exception of the puzzle they were not "intended and designed for the amusement of children only." It would require the skill of an adult mind to play therewith intelligently. In so playing, of course, these articles amuse, but being "reasonably fitted for the amusement of adults" indicates that they were not "intended and designed for the amusement of children only."

With this view we can not agree. Toys such as picture machines, bridges in sections, and many kinds of mechanical toys, require mental exercise to acquire amusement and pleasure. The articles at bar, in our view, meet precisely the definition of a toy in the *Illfelder* case, *supra*. If we were to disregard the proof of the Government as to what these articles were designed for, we think that it is apparent from the nature of the articles that they are designed for the amusement of children only and that they are reasonably fitted for no other purpose. It is at once apparent that these childish toy games are not reasonably fitted for the use of an adult unless, as was said by one witness, the adult had an "arrested" mental "development."

The Government attempted to prove commercial designation. It is not necessary for us to pass upon the question as to whether it did or did not succeed in doing so in view of the fact that we hold that these are toys within the common understanding as laid down in the *Illfelder* case, *supra*.

There is no proof in the record, to which we have been referred, of any of these articles ever having been used by an adult unless the adult was mentally deficient, as in the case of certain tuberculosis home patients. The record is replete with testimony to the effect that this class of toys is used by children only.

Appellee's counsel argues that playing with games like these at bar is not the character of play which is characteristic of the use of a toy and that the playing with these is not the character of amusement referred to in the *Illfelder* case, *supra*. Appellee further contends that the issues in this case are controlled by the decision of *United States* v. *Field & Co.*, 12 Ct. Cust. Appls. 543, T. D. 40738, which involved children's ninepin and tenpin games, and *United States* v. *Strauss & Co.*, 13 Ct. Cust. Appls. 167, T. D. 41025, which involved a lotto game. These cases, as well as the more recent case of *Wanamaker* v. *United States*, 17 C. C. P. A. 251, T. D. 43674, involving a jig-saw puzzle so complicated as to be reasonably fitted for the amusement of adults, rest upon an entirely different principle than the principle involved in the merchandise at bar.

Counsel would have us consider the merchandise at bar in the same category as the *junior ninepins*. The ninepin game was played by the child with the same kind of equipment and in the same manner as the game was played by adults, except the equipment was made smaller for the convenience of the child. It is not contended that the articles at bar are the junior editions of anything which is larger and which is used by grown-ups. Special emphasis in this particular is made with reference to Exhibit 1, "Bull board." It would require a far stretch of the imagination to regard this toy piece of pasteboard, with pasteboard disks, a junior edition of the shuffleboard which is

used by adults on shipboard. Following out the idea of the ninepin case, if the board and disks in the instant case were used in the same manner and possessed the same characteristics as in the shuffleboard game, with the exception that one was made smaller to adapt it to the size of the child, and not to his mentality, there would be more plausibility in counsel's argument. The "bull board" can not be regarded as junior to the shuffleboard, but can only be regarded as a toy designed and used solely for the amusement of children.

Counsel's argument, if followed to its logical conclusion, would be to the effect that any article, although it possessed all the characteristics of a toy, if used by the child in playing a game under any kind of rules requiring simple calculation or close observation and study, would be, for that reason, not entitled to a toy classification. In answer to this it would seem to be sufficient to say only that the ingenious mind of the child finds a way to play a game with almost every kind of toy used by children.

We do not mean to say that all games with which children play are toys, but in this decision we mean to hold that the simple toys under consideration here, although they involve the element of a game, are not such as should be denied toy classification.

The judgment of the United States Customs Court is *reversed* as to all exhibits except the one referred to as Exhibit 2, "The children's railroad," and as to this exhibit the judgment is *affirmed*.